# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### ELKINS

**JOSEPH HUTTON,**

       **Plaintiff,**

**v.**                                   **Civil Action No.: 2:14CV63**
                                                **(JUDGE BAILEY)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

       **Defendant.**

## REPORT AND RECOMMENDATION

### I.   INTRODUCTION

On August 14, 2014, Plaintiff Joseph Hutton ("Plaintiff"), by counsel Scott B. Elkind, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1). On November 10, 2014, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 6; Admin. R., ECF No. 7). On December 10, 2014, and January 8, 2015, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 10; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 13). Plaintiff did not file a Reply to Defendant's Brief. On February 11, 2015, an oral argument hearing was held by Magistrate Judge Robert W. Trumble. Scott B. Elkind, counsel for Plaintiff, and Joseph Langkamer, Assistant United States Attorney, participated by telephone.

Following the oral argument hearing and review of the motions and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.   PROCEDURAL HISTORY

On May 28, 2011, Plaintiff filed his application under Title II of the Social Security Act for Disability Insurance Benefits ("DIB") and under Title XVI of the Social Security Act for Supplemental Security Income ("SSI") alleging disability beginning on June 1, 2009. (R. 135-136).  The claims were denied initially on September 6, 2011, (R. 65-69) and denied again upon reconsideration on December 6, 2011. (R. 63). On January 6, 2012, Plaintiff filed a written request for a hearing (R. 81-82).  The hearing was held before Phylis M. Pierce on April 2, 2013, in Hagerstown, Maryland. (R. 44-61). Plaintiff, represented by counsel, Alan Nuta, Esq., appeared in person and testified, as did Bob Lester, an impartial vocational expert. (R. 44). On April 15, 2013, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 27-38). On June 14, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1).

## III.   BACKGROUND

### A.  Personal History

Plaintiff was born on December 17, 1963, and was forty-nine (49) years old at the time of the April 2, 2013, administrative hearing before ALJ Phylis M. Pierce. (R. 47). Plaintiff is married and has three adult children, who do not live with him. (R. 49, 568). Plaintiff testified he graduated from high school and completed two years of college.  (R. 47, 568). Plaintiff worked as a carpenter

from 1996 until June 1, 2009. (R. 48). Plaintiff's work mostly involved building forms to pour concrete and concrete finishing. (R. 48). He built sewer plants and wastewater plants and bridges. (Id.). Plaintiff testified that he stopped working in 2009 because his back went out. (R. 55). The ALJ further asked if Plaintiff was "laid off" and Plaintiff responded "Yes, ma'am." (Id.). He drew unemployment benefits for about a year and a half thereafter while looking for work. (R. 48). Plaintiff gets a disability check from the Veterans Administration (VA) in the amount of $631 per month. (R. 49). Plaintiff testified that the VA has given him a thirty percent (30%) disability on his neck from a cervical disc disease and a ten percent (10%) disability on his left arm. (R. 52).

**B. Medical History**

ALJ Pierce found Plaintiff suffered from the following severe impairments: chronic pulmonary disease, cervical and lumbar degenerative disc disease, and mood disorder. (R. 29). Additionally, the ALJ found Plaintiff suffered from the following non-severe impairments: headaches, gastro esophageal reflux disease, hypertension, hearing loss, subjective tinnitus, and right hand tremor and has a history of vocal cord paralysis. (Id.)

**1. Medical Evidence prior to onset date**

Plaintiff entered active service for the Marines on February 2, 1988, and was released from active service on February 1, 1992. (R. 232). Dr. Vaghei examined Plaintiff on June 29, 1997, for a Compensation and Pension Exam Report for the Veterans Administration Medical Center (VAMC) Martinsburg. The report contained the following medical history: "In 1992, he was doing some physical exercise and injured his neck. He went to a clinic in Camp Lejuene at North Carolina and he was sent to a base hospital. X-rays were taken and diagnosis of degenerative arthritis was made. He received some medications with neck support." (R. 232). Plaintiff's subjective complaints were,

> Pain and stiffness in the neck aggravated with movement. At the present time he is a student in college and he is studying electronic technology. He states that he has no problem with his neck except stiffness in movement. With a quick movement of the neck pain usually shoots in the back of the neck towards his head.

(Id.). The objective findings at the exam on June 29, 1997, were as follows:

> This is a 33-year-old veteran who does not appear to be in any acute distress. Posture and gaits are normal. He is able to walk tiptoe, heel, side of feet with no problem. Paravertebral cervical muscles are well developed and no tenderness or spasms noted in manipulation of the neck.

(R. 233). Dr. Vaghei's diagnosis was "[e]arly spondylosis C5 with limitation of the range of motion secondary to pain." (R. 233).

The following is an abbreviated summary of the medical records one year prior to the onset date. An ENT consult appointment was scheduled for the Plaintiff at Baltimore VAMC for July 1, 2008.

On July 2, 2008, Dr. Timothy, Plaintiff's primary care physician, requested a CT of Plaintiff's head because Plaintiff had hoarseness of voice and was a smoker; a CT of neck soft tissue; and a CT of chest. (R. 351). Dr. Saluj interpreted the CT of head and neck as "normal" and the CT of the chest as "mild emphysematous changes. Otherwise within normal limits." (R. 351-353).

On July 3, 2008, Dr. Timothy scheduled an appointment for Plaintiff with an audiology consultant, Dr. Shallis. (R. 366-367). Dr. Shallis noted that "Results support a fairly symmetrical, bilateral sensorineural hearing loss. Hearing aids are not recommended at this time." (R. 367). Further, Dr. Shallis' reported no functional communication problems. (R. 366).

On July 16, 2008, Plaintiff underwent laryngoscopy by Dr. Wolf at the Baltimore VAMC. (R. 526). It was an outpatient procedure. (Id.).

4

On July 31, 2008, Dr. Timothy reported that Plaintiff underwent laryngoscopy at the Baltimore VA and Plaintiff wondered what the results were because he did not go to follow up on July 29, 2008. (R. 411). Report from Baltimore showed no evidence of dysplasia or malignancy and Plaintiff was told to follow up with ENT. (Id.). Baltimore requested a ppd test which was performed on August 4, 2008 and results were negative. (R. 409).

On September 12, 2008, Dr. Timothy scheduled a Pulmonary Diagnostic Study Report that took place on October 10, 2008. On October 10, 2008, Dr. Timothy noted that Plaintiff cancelled appointment with ENT in Baltimore because his voice felt back to normal. (R. 406). Plaintiff also reported being down to smoking three cigarettes a day and agreed to try the patch. (Id.).

On October 15, 2008, Dr. Timothy sent letter to Plaintiff describing the results of the Lung Function test which were consistent with moderate Emphysema. (R. 405).

On May 17, 2009, Plaintiff reported to the Emergency Room of the Veterans Administration Medical Center (hereinafter "VAMC") for low back pain, where he was treated by Dr. Ambroz. (R. 400). Plaintiff complained that he had pulled a muscle in his back when picking up his granddaughter. (R. 401, 403). He reported that had this same pain in the past and it would go away in a week. (R. 403). He was given Toradol, which helped a little and was sent to X-rays. (Id.) When he came back from x-rays, he was given another Toradol and he left before a further evaluation could be performed. (Id.). Dr. Ambroz assessed the Plaintiff with low back strain. No meds were written. (R. 402).

On May 20, 2009, Plaintiff returned to the ER for a follow up exam stating his back was worse when he gets up in the morning. (R. 398). The nurse noted that Plaintiff was smoking a half a pack a day but trying to quit and advised him of ways to help him quit. (R. 400). Dr. Timothy reported that Plaintiff was seen for complaint of back pain after lifting up his

granddaughter. (R. 397). No pain was reported in leg and no numbness. (R. 397). Dr. Timothy noted that Plaintiff "ambulates well." On May 20, 2009, Dr. Timothy requested thoracic spine imaging. (R. 349). Dr. Fleming interpreted this image as a "normal thoracic spine." (R. 350). Nurse Adam's noted that Plaintiff's chief complaint was follow up for back pain and he described pain as dull aching in his bones. (R. 398).

On May 27, 2009, Dr. Ambroz requested imaging of the lumbar spine. (R. 350). Dr. Morris interpreted those images with primary diagnosis as minor abnormality. (R. 351).

## 2. Medical records from June 2009, alleged onset date.

On June 2, 2009, Nurse Barnes noted in the record that Plaintiff reported with pain in the central entire spine but especially in the thoracic area. (R. 395). Plaintiff further reported that he has had the pain on and off for the last several years but his last episode was four weeks ago and it had not subsided. (R. 396.). Plaintiff further reported that "…he has not been able to work at his job in construction in three weeks. He related that he was told years ago to change professions but he states that he has been unable to do so and still support his family." (R. 396). Patient agreed to attend physical therapy to attempt to decrease the pain and increase the trunk and cervical mobility. (R. 396). Patient was issued a TENS unit and a cervical pillow. (R. 396, 358). A home treatment plan was given for four weeks then follow up. (R. 397). Nurse Barnes noted that Plaintiff called after his appointment stating that "…he thinks he is going to be laid off work for a month so attending the sessions won't be a problem." (Id.).

Dr. Timothy referred Plaintiff to Dr. Kee, a physical therapy consultant, for evaluation and treatment. (R. 360). On June 2, 2015, Plaintiff reported to Dr. Kee. During the exam, Plaintiff told Dr. Kee that he had been told years ago to change his profession but he couldn't do that and

6

support his family. (Id.). Dr. Kee's assessment was that Plaintiff would benefit from rehabilitation for patient education and to attempt to decrease level of pain. (360, 396). Plaintiff agreed to attend physical therapy to attempt to decrease the pain and increase his trunk and cervical mobility. (R. 361). Additionally, Plaintiff was given a TENS unit, a cushion and large MHP and a cervical pillow. (Id.). Dr. Kee also requested a "warm to form l/s support to be used while at work." (Id.) Dr. Kee's goal was to reduce Plaintiff's pain and improve his sleep. (Id.).

On June 4, 2009, Plaintiff reported for his first physical therapy treatment session. (R. 393). Dr. Kee noted that Plaintiff reported his cervical and back pain was level 4/5 out of ten pain scale. Plaintiff further reported that he has had cervical pain for fifteen years after an injury in the service doing chin ups. (Id.). Plaintiff complained that his back had hurt for a couple of weeks now. (Id.). Dr. Kee used intermittent pelvic traction as treatment. After this treatment, Plaintiff reported pain at a seven. Dr. Kee discontinued traction and ultra sound, noting moist heat at his next visit. (R. 395). If tolerated, Dr. Kee would start Plaintiff on William's and McKenzie back exercises. (Id.).

On June 5, 2009, Plaintiff reported to Dr. Kee for his second physical therapy treatment session. (R. 391). Plaintiff reported to Dr. Kee that "I don't have any back pain right now, but the neck is hurting, I used that TENS thing at home on my back, maybe that's why my back doesn't hurt." (R. 391). Plaintiff reported a pain level of four on arrival and a pain level of zero after session. (Id.). Dr. Kee reported Plaintiff was independent in his home exercise program (HEP) which consisted of "Pelvic tilt, single knee to chest/then alternate leg, abdominal isometric exercise, partial sit ups, hamstring stretches. All exercise within a pain free range. 10 of each, holding for slow count of five." (R. 383). At this time, Plaintiff was given an HEP of Williams and Mckenzie back exercises and issued a Back Owner's Manual.

On June 9, 2009, Plaintiff reported to Dr. Kee for a physical therapy treatment session. (R. 390). Plaintiff's subjective complaints on that date were, "I really don't have any real pain, it's a soreness feeling between the shoulder blade, I guess it would be a four, I don't know." (Id.). Plaintiff further reported using the TENS unit helped him. (Id.) After treatment, Plaintiff reported a reduction in pain to a one or two level. (Id.).

On June 10, 2009, Plaintiff reported to Dr. Kee for a physical therapy treatment session. At this treatment session, Plaintiff reported that, "[t]he back doesn't really hurt, it's like a feeling of a bruise now, about a 2 level." (R. 388). Dr. Kee reported Plaintiff's pain was a level one after session. (R. 389).

On June 16, 2009, Plaintiff reported to Dr. Kee for his physical therapy treatment session. (R. 386). Dr. Kee reported that Plaintiff is experiencing pain all over today and reports a level five pain. (R. 386). Treatment was a deep tissue massage, then sedative massage to cervical, thoracic and lumbar spine. During massage Plaintiff complained his hips were hurting. (R. 386). After therapy, Plaintiff reported a level two pain between the shoulder blades, his headache gone and his neck was feeling good. (Id.).

On June 17, 2009, Dr. Kee reported that Plaintiff's pain level was a four on this date and that Plaintiff complained that as soon as he left his physical therapy session last time, by the time he got to his car his headache was back and the pain had come back. (R. 385). Dr. Kee reported decreased pain with heat and traction. (R. 385). Dr. Kee noted that if there was no improvement in two weeks that he would consider a trial of iontophoresis to the right thoracic paraspinal area. (R. 385). His goal was for Plaintiff to be able to control pain with home program only and keep pain at a three or below. (R. 386).

On June 23, 2009, Dr. Kee reported that Plaintiff had a pain level of two of cervical area. (R. 383). Plaintiff reported no back pain but claimed that his pain moves around from day to day. (Id.). Plaintiff further reported no pain after applying moist heat to cervical and static cervical traction. (Id.). Dr. Kee noted in June 23, 2009 report that Plaintiff had "Decreased pain with heat and traction. No back pain reported today. Independent with home TENS and HEP." Dr. Kee noted on the same date that Plaintiff "has met and or surpassed all goals and is discharged at this time to HEP only." (R. 384).

On July 7, 2009, Dr. Timothy requested cervical spine with obliques imaging. (R. 348). On July 17, 2009, Dr. Jung interpreted images of Plaintiff's cervical spine as follows: "Evaluation of the cervical spine demonstrates mild narrowing of the disc height with small osteophytes at C4-5, C5-6, and C6-7 levels. There are no fractures or compression deformities." (R. 336). Dr. Jung's impression was that Plaintiff had "mild to moderate degenerative disc disease with osteophytes at C4-5, C5-6, and C6-7." (Id.). On July 20, 2009, a letter was sent to Plaintiff from Dr. Timothy regarding these impressions. (R. 376).

On July 17, 2009, Dr. Timothy saw Plaintiff for a follow up. Plaintiff reported that therapy helped though he still occasionally got back and neck pains; that he felt the neck traction helped; and that he no longer had pain down his arm or numbness. (R. 377). Dr. Timothy also noted that Plaintiff is not working in construction anymore and planned to start an Internet company. (R. 377). Plaintiff was smoking two to three cigarettes a day. (R. 378, 381). Dr. Timothy noted negative edema of extremities and no calf tenderness, no focal, motor or sensory deficits. (R. 379). Dr. Timothy's treatment plan was to renew medications, low salt, low cholesterol, low fat and exercise in the form of "walking daily." (R. 379). Nurse Linda Lee noted that Plaintiff claimed that he takes tramadol for his neck pain but when he does he gets a headache so he doesn't use it

often. (R. 380). Nurse Lee performed a functional screen at this appointment which indicated Plaintiff had no functional concerns/needs involving eating, dressing, walking, using a wheelchair or using the bathroom at this time. (R. 381). His fall risk screening showed that Plaintiff had not fallen during the past year. Plaintiff has no dizziness and no nutritional concerns. (Id.). On September 29, 2009, Nurse Miller reported a telephone call from Plaintiff requesting renewal of Tramadol. (R. 375).

On November 6, 2009, Dr. Timothy reported that Plaintiff is a "thin built man in in [sic] no acute distress." (R. 371). He "walks without assistance." (Id.). Further Dr. Timothy noted no spine tenderness, bilateral arm movements normal and no weakness. (Id.) The x-ray of the spine showed mild to moderate degenerative disc disease. (R. 372). Dr. Timothy prescribed gabapentin for numbness in arm and tramadol for pain. (Id.). Plaintiff declined medication for tobacco use cessation. (Id.). Nurse Linda Lee noted that Plaintiff reported for evaluation of his chronic medical problems, which include increased pain to neck that radiates to lower back, hips, legs, and both hands. (R. 373). The nurse noted that Plaintiff is still an occasional tobacco user. (Id.).

On December 7, 2009, Dr. Timothy requested an MRI C-spine without contrast. (R. 347). Dr. Saluja's interpretation of that MRI was: "mild posterior disc osteophyte complexes at C4-5, C5-6, C6-7 with mild to moderate bilateral foraminal narrowing and mild central stenosis." (R. 335, 348, 480).

On December 11, 2009, Dr. Timothy contacted Plaintiff about the MRI findings. Plaintiff reported that he feels the gabapentin helps and Dr. Timothy continued him on the medication for now and noted he could continue activity as tolerated. (Id.). A letter from Dr. Timothy on December 11, 2009, informed the Plaintiff of the findings from the MRI and further noted that "[f]indings were not significant at this point for any surgical intervention, continue therapy at home

and medications." (R. 510).  On December 21, 2009, Dr. Timothy returned patient's call about his medications.  (Id.).

On January 25, 2010, Plaintiff met with Dr. Powers, an audiologist, to have his hearing acuity assessed.  (R. 507).  Plaintiff was advised to discuss his medication with his primary care physician, Dr. Timothy, and to reduce his caffeine and smoking which can exacerbate tinnitus.  Dr. Powers reported that no further treatment was indicated. (R. 509).

On February 8, 2010, Dr. Santos performed a Compensation and Pension Examination of Plaintiff.  (R. 246-264, 490-507).  A summary of his examination and opinions are contained in the section on medical opinions below.

On April 20, 2010, Plaintiff reported to Optometrist Gentry complaining of black spots in his eyes since December and headaches.  (R. 486).  Plaintiff rated his pain 5-6 as distressing pain. (Id.).  Upon examination Dr. Gentry noted Plaintiff's general appearance as normal, no acute distress.  (487).

On May 3, 2010, a letter was sent to the Plaintiff for not showing up for an appointment. (R. 485).

On June 3, 2010, Plaintiff reported to the eye clinic with complaints of black spots in front of both eyes since December. (R. 481).   He noticed the black spots and a ringing in his ears after he started a medication.  (Id.).   Optometrist Gentry found nothing abnormal.  (R. 483).

On August 3, 2010, Dr. Jung Joo Suh indicated that the reason for the study was sharp pain in chest and smoker.  (R. 333).  Dr. Suh had two images of the chest and compared them to a previous study on June 26, 2008.  (R. 334).  Dr. Suh indicated in his review that the lungs were clear, the heart was normal, the structures were unremarkable and therefore his impression was no acute chest process.   (Id.).

On September 10, 2010, there is a chiropractic note stating that the Plaintiff is feeling about the same as he did in June of 2010. (R. 331). Dr. Neff, chiropractic doctor, reported that patient has not made any significant progress towards short term goal of pain control. (Id.). Plaintiff stated the thing that helped him the most was cervical traction. (R. 331). On the same date Dr. Ostrow, Plaintiff's primary mental health provider, noted that Plaintiff was seen for a follow up visit. (R. 326). In Dr. Ostrow's brief history, he noted that Plaintiff's last visit was in July of 2010. Dr. Ostrow noted that it might be possible via a sedating antidepressant like mirtazapine to improve his depression, anxiety and sleep issues, "which might then make his whole chronic pain issue more tolerable." (R. 326). However, Dr. Ostrow noted that the mirtazapine had a marginal benefit at best and though his sleep might be better. (Id.). Further, Plaintiff complained that the longer he sleeps the stiffer he feels on awakening, but none the less sees the merit in addressing sleep and depression. (Id.). Therefore, Dr. Ostrow reported that Plaintiff agreed to increase his mirtazapine prescription to 45 mg. (R. 326).

On October 4, 2010, Dr. Koch, VAMC Gastroenterologist, wrote a letter to Plaintiff with results of his colonoscopy. (R. 773). A benign polyp was found and Plaintiff was advised to have another colonoscopy in five years. (Id.).

On March 2, 2011, the Plaintiff reported to the Emergency Room of the VAMC for back pain. (R. 295-98). Plaintiff reported with pain at a nine out of ten, ten being the most severe pain. Plaintiff was given morphine and his pain rating was reduced to five or six out of ten. (R. 298). Plaintiff was discharged but Patient's pain relief goal had not been met and Dr. Ambroz, the treating physician, was notified. (R. 298).

On March 11, 2011, Plaintiff reported to Dr. Ostrow for a follow up at the mental health clinic. (R. 285). Dr. Ostrow gave a brief history reporting that Plaintiff was last seen in September

2010, and continued taking Mirtazapine through late 2010, but has not taken it in the past few months. (R. 285). "Ultimately his major pain continues to significantly impact mood, anxiety and sleep and he gets frustrated with perceived lack of benefit of psychotropics but we realistically discuss what benefits he might actually expect." (R. 285). Dr. Ostrow further noted that Plaintiff agreed to retry Mirtazapine. (Id.).

On April 28, 2011, Plaintiff reported to the VAMC for evaluation of chronic medical problems. (R. 278). Plaintiff's chief complaint was ongoing discomfort in left shoulder, lower back and hips. (Id.). Nurse Adams noted that Plaintiff had not used tobacco in ten months. (Id.). Medications were reviewed with Plaintiff and renewed. (R. 275). Plaintiff stated that he had used his wife's advair, which helped, he stopped smoking and he gets back and neck pain "on and off."

On May 13, 2011, Plaintiff had a follow up at the mental health clinic with Dr. Ostrow. (R. 269). In Dr. Ostrow's brief history, he noted that Plaintiff was last seen in March 2011 when he resumed taking his mirtazapine. Plaintiff stated that while he did have some improvement in his sleep that ultimately his pain level prevented any major benefit from this drug. (R. 270). Dr. Ostrow further noted that although Plaintiff only rated his pain as a five out of ten, Plaintiff "shifts positions, winces or grimaces due to pain." (R. 270). Dr. Ostrow recommended continuing with the mirtazapine. (Id.).

On May 31, 2011, Nurse Marshall noted during a blood pressure check that Plaintiff appeared sleepy. (R. 267). Plaintiff reported that he was not sleepy but felt like he was in a "fog" and that he felt like that every morning. (Id.). Further, Plaintiff reported that he is taking Mirtazapine and he is now getting four to six hours of sleep, which is an improvement. (Id.).

On June 8, 2011, Nurse Sauble noted in her blood pressure check of Plaintiff that Plaintiff had started on new medication last week and had reported no side effects. (R. 264). Dr. Shih had no medication changes after this blood pressure check. (R. 265).

On August 1, 2011, Dr. Moran of the VAMC provided a consultative examination regarding evaluation for possible gulf war conditions. (R. 623). A summary of his findings are located in the medical opinions section of this report and recommendation.

On August 5, 2011, Dr. MacDonald, a psychologist, performed a mental status examination (MSE) and a clinical interview (CI) of Plaintiff. (R. 567-569). This consultative examination report is discussed in the medical opinions section of this report and recommendation.

On August 10, 2011, Dr. Comer, a psychologist for the DDS, provided a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment based on Dr. MacDonald's report and the other evidence of record. (R. 570-582). A summary of his opinions is also provided below.

On August 11, 2011, Plaintiff met for a follow up with his primary mental health provider at the VAMC, Dr. Ostrow. (R. 682). Plaintiff complained of issues with late in the day irritability, short temper. (R. 683). Dr. Ostrow noted that, "[a]s in the past it is most difficult to separate out primary MH issues from ever present poorly controlled pain." (Id.). Plaintiff was prescribed a new drug aripiprazole to help with his irritability. (R. 685).

On August 15, 2011, Dr. Web performed a Disability Determination Examination for the DDS. (R. 588). A summary of that consultative examination is below.

On August 16, 2011, Plaintiff met with Dr. Menon complaining of decreased urine flow and some incontinence. (R. 675). Dr. Menon prescribed medication and advised if symptoms persist then she would consider referral to urology. (R. 677). Nurse Aikens noted from that visit,

14

the functional screening showed that Plaintiff had no functional concerns/needs involving eating, dressing, walking, using a wheelchair or using the bathroom at this time. (R. 680). Further Nurse Aikens noted that Plaintiff was counseled on the importance of regular exercise and/or physical activity to control his blood pressure. (R. 682). Plaintiff was instructed to exercise for at least thirty minutes three times per week. (Id.).

On August 17, 2011, Dr. Lateef provided a Physical Residual Functional Capacity Assessment in which she reviewed Dr. Webb's report as well as the other evidence for record. On September 2, 2011, Dr. Lim agreed with Dr. Lateef's analysis. (R. 600).

On March 19, 2012, Plaintiff reported to Dr. Havron for a routine appointment. (R. 840). Nurse Pierce reported at that visit Plaintiff's chief complaint was back pain and medicine refills. (R. 841). Nurse Pierce further reported that Plaintiff was a new patient for Dr. Havron that Plaintiff had been transferred from another team. (R. 841).

On May 16, 2012, Plaintiff met with Dr. Menon for follow-up and reported headaches. (R. 897).

On June 18, 2012, Plaintiff met with Dr. Ostrow for follow up mental exam. (R. 892). No changes were made in meds. (Id.).

In November 2012, Plaintiff saw Dr. Menon who ordered imaging of Plaintiff's cervical spine, lumbar and spine, chest views and spirometry testing. (R. 849-851). Impressions from these imagings were compared to previous imagings. (Id.). No significant changes were seen in the new imagings. (Id.). On November 25, 2012, Plaintiff reported to the VAMC emergency room with chest pains. (R. 876). Plaintiff was discharged the same day to follow up with stress test. (R. 872).

In December of 2012, Dr. Menon wrote Plaintiff giving him the results of the spirometry test, which were mild COPD and more testing recommended. (R. 858). On December 18, 2012, Plaintiff requested a urology consult. On December 18, 2012, Plaintiff saw Optometrist Misera and got a new eye glass prescription. (R. 866). On same date, Plaintiff also had a follow up with Dr. Ostrow, his psychiatrist. (R. 860).

On January 1, 2013, Plaintiff reported to Dr. Hamidinia, urologist, complaining of lower urinary tract symptoms. (R. 857). Dr. Hamidinia noted Plaintiff had a voiding dysfunction. (Id.). On January 30, 2013, Dr. Hamidinia reviewed results from imaging finding kidneys normal size, no renal masses, and prostrate was enlarged. (R. 845). However, the Doctor determined no alert was required. (Id.).

**3.    Medical Opinion Evidence**

**A. Randolph MacDonald, Ed. D., (Consultative Psychological Examiner, DDS).**

After completing a mental status examination and a clinical review, Dr. MacDonald opined on August 5, 2011 as follows: Plaintiff suffers from "Mood Disorder Secondary to Medical Condition" and "Emphysema, headaches, ringing in the ears, hearing loss, pain in the back, muscles, joints and hips, acid reflux, seizures, loss of feeling in his left arm, hand, and leg, fatigue, and vision problems." (R. 569). Dr. MacDonald's prognosis was poor stating that he didn't see "…these conditions improving anytime soon." (Id.). Additionally, he opined that Plaintiff's capabilities were fair noting that, "[h]e probably cannot concentrate long enough to handle at least simple finances." Dr. MacDonald noted in his mental status examination that, Plaintiff's

> …cognitive ability was probably average. His insight seemed good. His judgment was good within normal limits. His immediate memory was good. He remembered four words immediately after having them read to him. His recent memory was also good. He remembered the same four words about eight minutes later….

> Concentration was poor. He could not do serial 3's and his Digit Span was deficient.

(R. 568-69). Dr. MacDonald noted in the vocational background section of the report that, "[t]his claimant had extreme difficulty staying in one place in the chair, obviously his back is creating a lot of problems for him and I suspect that is probably why he is unable to work." (R. 568).

### B. Dr. Garcia Santos – (Consultative Examiner for VA Compensation and Pension)

Dr. Santos opined on February 8, 2010 as follows:

> The CONDITION/DISABILITY Unemployability IS NOT CAUSED BY OR A RESULT OF service connected neck condition. RATIONALE FOR OPINION GIVEN: The veteran states he stopped working because of both back and neck conditions. He was seen in May 2009 in the ER for an acute flare-up of lower back pain. He has limitation from his service connected cervical spine condition, but also limitations from his non-service connected lumbar spine condition. Both will limit him from returning to his usual occupation- construction work. However, he can be retrained and most likely will benefit from sedentary employment where he can refrain from lifting, prolonged walking, prolonged standing, pushing and pulling activities which can impact on his spine.

(R. 264). Following review of the medical records and physical examination of the Plaintiff, Dr. Santos found that Plaintiff's degenerative arthritis and cervical spine problems started in 1992. (R. 246). Plaintiff's condition has progressively "…increased with constant pain and stiffness as well as radicular symptoms." (Id.). In May of 2009, Plaintiff stopped working because of neck and back pain and around that time Plaintiff started experiencing incoordination of the left shoulder and arm with tingling, numbness, locking and pain of the fingers of the left hand. Gabapentin was prescribed and Plaintiff stated that the paresthesia and numbness improved but the pain was still present. (Id.). Dr. Santos reported that there were no current side effects from treatment. (Id.).

Dr. Santos noted that Plaintiff's neck and back pain were moderate in severity, were constant in duration and were daily in frequency. (R. 248). Dr. Santos opined that Plaintiff's functional impairments during flare-ups of the neck should be not driving or doing any chores

requiring overhead lifting and reaching and of the back he should pace his walking and lifting. (R. 249). Dr. Santos noted that his limitation on walking is a quarter of a mile. (Id.). Further Plaintiff has no limitation on standing. (R. 258). In Dr. Santos's summary of all problems, diagnoses and functional effects, he stated that his diagnosis is degenerative disc disease, arthritis and cervical spine. (R. 255). He further reported throughout that these problems created no limitations for Plaintiff in the areas of feeding, bathing, dressing, toileting and grooming. (R. 258).

Dr. Santos reported that "No significant postural problems from his neck, no anklosis is noted in the cervical spine as to produce compensatory postural problems which may affect his gait. Gait is normal. No scoliosis is noted. Thoracic spine is normal." (R. 262).

### C. Dr. Robert Moran- (Consultative Examination for VA Compensation and Pension for evaluation under Gulf War guidelines for undiagnosed illnesses or unexplained chronic multisymptom illnesses).

On August 12, 2011, Dr. Moran opined as follows:

> I would opine that this veteran's symptoms can all be explained based on known pathology and that an undiagnosed illness does not need to be hypothesized. This veteran suffers from chronic pain related to cervical and lumbar disc disease. He has chronic headaches which are also related to cervical disc disease. He also experiences dyspnea on exertion due to COPD. He suffers mood disorder for which he is followed by psychiatry which has been opined as secondary chronic medical issues. His mood disorder is most probably responsible for problems with sleep impairment and memory disturbance. The veteran's GI symptoms of intermittent constipation and intermittent loose bowel movements are by the veteran's admission related to medication taken for chronic pain. The veteran now notes gradual development of overall chronic pain affecting all joints and muscle groups which is additional to his previous symptoms of chronic neck and back pain…. This case does have similarities with case of fibromyalgia however as this case of chronic pain syndrome arises from previously well-defined cervical and lumbar pathology it does not meet the gulf war criteria of a 'diagnosed medically unexplained chronic multisystem illness.'

(R. 655-56, 728-29).

**D.      Christopher France, Doctor of Audiology- (Consultative Examination for VA Compensation and Pension)**

On August 3, 2011,  Dr. France, a Doctor of Audiology at the VAMC opined that the Plaintiff's hearing loss does not impact Plaintiff's daily life nor his ability to work.  (R. 695). Regarding Plaintiff's tinnitus, the Doctor opined that it is probably a symptom of his hearing loss and is probably a result of military noise exposure.  Further, Dr. France opined that Plaintiff's tinnitus does not impact ordinary conditions of his daily life nor his ability to work.  (R. 697).

**E.      Dr. Robert F. Webb, (Medical Examiner, DDS)**

On August 10, 2011, Dr. Webb met with the Plaintiff in Ranson, West Virginia for a Disability Determination Examination.  Dr. Webb reported that the Plaintiff was a forty-seven year old male with a long history of back problems.  (R. 588).  Dr. Webb performed a thorough physical examination of Plaintiff and reviewed medical records.  During the physical examination, Dr. Webb reported that

> He was able to stand up from the chair with his arms held up.  He pointed to the upper thoracic spine and through the entire lumbar spine areas as site of the pain today.  He had a lot of paravertebral muscle spasm through his spine and he sat bent forward and leaning to the right.  He shifted his weight from side to side….

(R. 590).

Dr. Webb further opined that Plaintiff's neck felt okay.  (Id.).  His chest was clear and his cardiac exam was normal.   (Id.). Plaintiff could squat fully, could walk on his heels and toes. (Id.).  He guarded against range of motion of the cervical spine and resisted the Spurlings' test because of pain.  (Id). Dr. Webb's impressions were as follows:

> 1.  Chronic pain syndrome with chronic low back pain, chronic neck pain, chronic upper back pain.
> 2.  Intermittent numbness in the left upper extremity suggestive of cervical spine disk with nerve root irritation.
> 3.  Tobacco abuse history.

4. History of alternating constipation and diarrhea
5. Hoarseness with history of vocal cord paralysis.
6. History of depression with anger control problems and mood swings.
7. History of left side hearing loss and tinnitus. The patient did seem to hear me okay on the exam today.

(R. 591).

## 5. DDS Medical Assessments and Case Analysis

On August 10, 2011, Dr. Philip E. Comer completed a Psychiatric Review Technique report. (R. 570). Dr. Comer reported that an RFC assessment was necessary for 12.04 Affective Disorders. (Id.). Plaintiff was diagnosed with mood disorder which does not precisely satisfy the diagnostic criteria of 12.04 Affective Disorders. (R. 573). Dr. Comer rated Plaintiff's functional limitations as follows with regard to "B" Criteria of the Listings:

1. Restriction of Activities of Daily Life- Moderate
2. Difficulties in Maintaining Social Functioning- Moderate
3. Difficulties in Maintaining Concentration, Persistence, or Pace- Moderate
4. Episodes of Decompensation Each of Extended Duration- One or Two

(R. 580). Further, Dr. Comer opined that the evidence did not establish the "C" criteria of the listing either. (R. 581).

Dr. Comer also prepared a Mental Residual Functional Capacity Assessment on August 10, 2011. He opined that Plaintiff was not significantly limited in any of the categories listed A-D except as to the following categories which Dr. Comer identified Plaintiff as being moderately limited in:

B.5. The ability to carry out detailed instructions
B.6. The ability to maintain attention and concentration for extended periods of time
B. 7. The ability to perform activities with a schedule, maintain regular attendance and be punctual within customary tolerances.

B. 9.  The ability to work in coordination with or proximity to others
       without being distracted by them.

B. 11.  The ability to complete a normal workday and workweek without
       interruptions from psychologically based symptoms and to perform
       at a consistent pace without an unreasonable number and length of
       rest periods.

C. 12.  The ability to interact appropriately with the general public

D. 17.  The ability to respond appropriately to changes in the work setting.

(R. 584-85).  Dr. Comer concluded that

> Claimant's statements are reasonably consistent with CE and VA treatment notes
> and are credible from his perspective.  However, he appears to have the
> mental/emotion capacity for work like activity in a work environment that does
> not require sustained concentration or more than limited social interaction and
> that can accommodate his physical limitations.

(R. 586).

On November 9, 2011, Dr. G. David Allen, DDS, confirmed Dr. Comer's mental

assessment as written.  (R. 818).

On August 17, 2011, Dr. Atiya M. Lateef of the DDS, wrote a Physical Residual

Functional Capacity Assessment for the Plaintiff.  Dr. Lateef reported that Plaintiff's primary

diagnosis was COPD, his secondary diagnosis was low back strain and his other alleged

impairments was chronic pain.  Dr. Lateef assessed the following exertional limitation for the

Plaintiff:  He could occasionally lift and/or carry twenty pounds.  He could frequently lift and/or

carry ten pounds.  He could stand and/or walk for a total of about six hours in an eight hour

workday.  He could sit (with normal breaks) about six hours in an eight hour workday.  He could

push and/or pull unlimited, other than as shown for lift and/or carry.  (R. 593).  Further Dr.

Lateef opined as to postural limitations as follows:  Plaintiff could occasionally climb

ramps/stairs, balance, stoop, kneel, crouch and crawl but could never climb ladders, ropes,

scaffolds.  (R. 594).  Dr. Lateef further opined that Plaintiff had no manipulative limitations,

visual limitations or communicative limitations. (R. 595). As for environmental limitations, Dr. Lateef noted that Plaintiff should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation. (R. 596). Additionally, Plaintiff should avoid all exposure to hazardous machinery, heights, etc. (Id.). Dr. Lateef reviewed the medical and non-medical evidence of record in assessing plaintiff's physical functional limitations. (R. 597). Dr. Lateef relied largely on Dr. Webb's physical examination of the Plaintiff and Plaintiff's report of daily activities. (Id.). In conclusion, Dr. Lateef opined that Plaintiff physical residual functional capacity should be reduced to light.

On December 5, 2011, Dr. Franyutti, DDS, affirmed Dr. Lateef's physical assessment as written. (R. 819).

On April 27, 2012, Marcia Amrine, wrote in her case analysis that,

There are subjective findings of ongoing pain despite prescribed treatment. Objective findings do not indicate significant neurological or motor deficits. No additional medical evidence was received. The initial RFC dated 8/17/11 and the recon RFC dated 12/05/11 which indicates the claimant retains the capacity to perform a full range of light work activity with some mental limitation, and can do other work is affirmed.

(R. 820).

## C.    Testimonial Evidence

At the ALJ hearing held on April 2, 2013 in Hagerstown, Maryland, Plaintiff testified that he was employed as a carpenter from 1996 until June of 2009. (R. 48). He testified that he was a form carpenter, meaning that he mainly built forms used for concrete. When the ALJ asked why Plaintiff stopped working in May of 2009, the Plaintiff responded, "… [m]y back went out." (R. 55). The ALJ then inquired, "Q: Were you laid off?" (Id.). The Plaintiff responded, "Yes, ma'am." (Id.). Plaintiff received unemployment from June of 2009 until around December of

2010, about a year and a half.  (R. 48).  Additionally, Plaintiff receives a disability check from the Veteran Administration (VA) in the amount of $631.00. (Id.).

Plaintiff testified that he is disabled because he "…can't do nothing."  (R. 49).  The pain medication "…helps, but it doesn't stop it."  (Id.).  In regard to his impairments, Plaintiff testified that he suffers from back, neck and joint pain, from muscle pain, from headaches, from high blood pressure, from respiratory problems (COP), from hearing loss and tinnitus and from depression and anger problems.  (R. 49-51).  Plaintiff testified that he has never had surgery for his back, neck or joint pain, but he did have physical therapy in 2010.  (R. 49).  The ALJ inquired as Plaintiff's forty percent VA disability and Plaintiff responded that thirty percent of his disability rating is on his neck from cervical disc disease and ten percent of the disability rating is on his left arm.  (R. 52).   Plaintiff testified that at the time of this hearing he was appealing his VA case to try to get a higher percentage of disability.  (R. 55).

In regard to medications, Plaintiff testified that he is on Cyclobenzaprine and Tramadol for muscle pain, Acetaminophen for migraine headaches, Gabapentin, high blood pressure, Lorazepam and Abilify for his mental problems and a powder pill and inhaler for his respiratory problems.  (R. 49-50).  Plaintiff also has hearing loss but hearing aids have never been recommended. (R. 51).  Additionally, Plaintiff complained of tinnitus, which is ringing in the ears, but takes no medication for that condition.  (Id.).

Plaintiff further testified regarding his daily activities as follows:  He needs no help with bathing or dressing. (R.52).   He does no house work.  (Id.).   He may wash dishes a minute or two when he can stand, but he does not cook, does no yard work, no laundry and doesn't drive. (R. 53).  Plaintiff testified that, although he holds a valid driver's license, he stopped driving two

years ago because it was too painful. (R. 53). He did ride to this hearing in a car and he rides in a car to his doctors' appointments. (R. 54).

Plaintiff also testified regarding his abilities and limitations as follows: He can only walk about a half of a city block and can only lift five pounds. Plaintiff's attorney pointed out that Plaintiff leaned on the desk throughout the hearing. Plaintiff testified that leaning on the desk took pressure off his lower back. (Id.). Plaintiff's attorney also pointed out that Plaintiff's right hand had tremors. (Id.). Plaintiff testified that it was a side effect from the medication. (R. 55). Plaintiff further testified that he lies down for four to five hours throughout the day but not all at once. (R. 56).

**D.    Vocational Evidence**

Also testifying at the hearing was Bob Lester, a vocational expert, hereinafter referred to as "VE". (R. 57-60). The VE characterized Plaintiff's past work as a carpenter, DOT title 860.381-022, medium exertional level with and SVP of seven. (R. 58). The ALJ found that Plaintiff could not return to his past work. (R. 58). The ALJ then questioned the VE regarding Plaintiff's ability to perform other work:

> Q:   …And ask you to assume an individual who is younger aged, with a high school education, the past work you've described and the residual functional capacity to: occasionally lift and/or carry 20 pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in eight; sit about six hours in eight; is unlimited in the ability to push and pull and that would consistent with light work; can never climb ladders, ropes and scaffolds; but can occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch and crawl; has no manipulative or visual limitation; no communicative limitations; but should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, fumes, odors, dust, gasses and poor ventilation; and avoid all exposure to work hazards, such as unprotected heights and

24

dangerous machinery. Are there jobs which exist in significant numbers in the national economy that such an individual could perform? If so, please describe those jobs and the number of jobs in the region of the claimant's residence and in the national economy.

A: Yes, ma'am. Light work available to such a hypothetical individual would include work such as a marker, specific to retail industry. The DOT –

Q: I'm sorry. Just – let me stop you a minute. This is a West Virginia case.

A: Yes, ma'am. Yes, ma'am. The DOT is 209.587-034. There are approximately 400 – or in excess of 400,000 in the national economy and approximately 6,000 in the region and the region being the state of West Virginia. Also work as a non-postal mail clerk. The DOT is 209.687-026. There are approximately 45,000 in the national economy and approximately 450 regionally. And finally, work as a router. The DOT is 222.587-038. There are approximately 76,000 in the national economy and approximately 1,000 regionally. Those are representative examples of light work, all with SVP: 2 consistent with the descriptions provided in the Dictionary of Occupational Titles.

Q: If I ask you further to assume this individual is limited to unskilled work, cannot work, cannot work with the public or have more than occasional interaction with coworkers and supervisors, could such an individual perform any of the jobs you've described?

A: I would think that the mail clerk and the router would be appropriate. The marker would be inappropriate. However, that could be replaced by work as a laundry sorter, 361.687-014, 50,000 in the national economy and approximately 600 regionally. And that is also consistent with the DOT.

(R. 59). The ALJ then further inquired as to whether there were jobs Plaintiff could perform if he "…experienced pain or mental impairment of the severity he could not concentrate or attend to basic job tasks…?" (R. 59). The VE responded "No, ma'am." (R. 60).

Plaintiff's attorney then questioned the VE regarding how much an employee can be off task and maintain employment and how much absenteeism there can be to maintain employment.

(R. 60).  The VE responded that an employee can be off task up to ten percent of the day and routinely can be absent from work a day and a half per month without impacting his ability to maintain employment.  (Id.).

**E.    Lifestyle Evidence**

On an adult function report dated June 26, 2011, Plaintiff stated that he has continuous pain in his lower, middle and upper back.  (R. 156).  Additionally, he has joint pain and constant head and neck pain.  (Id.).  He states that his pain makes it impossible to do anything physical for short periods.  (Id.)  He can't focus his attention and frequently forgets what he is doing or thinking from one minute to the next.  (Id.).  He stated that he hates talking to anyone because it's hard to hear and understand, which quickly gets him irritated and angry.  (Id.).

As for Plaintiff's daily routine, Plaintiff drinks coffee and takes medications then lounges around until the pain and stiffness lessons.  (R. 157).  Then he sits in a neck traction for ten to twenty minutes, watches television sometimes, eats supper, takes his medication and tries to go to sleep.  (Id.).  Defendant can no longer work, hold or interact with grandkids, read, fish or drive.  (Id.).  He also now has problems with his personal care.  (Id.).  He dresses slower.  Sometimes he has to re-bathe because he has forgotten to wash his hair.  (Id.).  He doesn't like going to barber shop because he has to sit too long.  (Id.).  He has no problem shaving or feeding himself unless his hand is numb then he needs help cutting.  (Id.).

As for meals and household chores, Plaintiff explained that he used to love to cook but he no longer has an interest.  (R. 158).  He can fix himself a sandwich or noodles or a snack but he usually doesn't have much of an appetite.  (Id.).  Plaintiff is still able to do laundry, make house repairs, mow and do the dishes when his wife reminds him.  (Id.).  Any bending or quick movements while doing these chores irritates Plaintiffs condition causing him pain.  (Id.).

26

As for Plaintiff's ability to handle money, he is able to pay bills, count change, handle a savings account and use a checkbook/money order. (R. 159). Plaintiff has a valid driver's license and can drive but claims that his driving is limited because it is painful. Plaintiff occasionally grocery shops for ten to fifteen minutes at a time, only picking up a few items such as milk and bread. (Id.).

In regard to hobbies, interests and social activities, Plaintiff stated his hobbies are reading, fishing and coin collecting. (R. 160). He doesn't read as frequently because he can't remember what's going on in a book. (Id.) He used to go fishing weekly and now he only goes two to three times per year. (Id.). Socially, Plaintiff does not spend time with others or go places except doctor's appointments or birthday parties and he usually leaves as soon as he can. (Id.). Plaintiff gets easily irritated if people talk too much so he usually stays to himself. (R. 161).

As for his abilities, Plaintiff stated he can lift less than ten pounds. (Id.). He can stand, sit, bend, and kneel usually no more than five to ten minutes. (Id.). He doesn't like to talk. His "...hearing usually always ringing...." (Id.). He can't concentrate more than five minutes at a time. (Id.). He only walks for a few minutes at a time and is very cautious climbing steps because in the past he has fallen. (Id.). Plaintiff writes that he tends to ignore problems until he explodes. (R. 162).

Plaintiff uses a TENS unit prescribed by physical therapist and a neck traction prescribed by a chiropractor. (Id.). He uses both daily to help with back and neck pain. (Id.).

As for side effects of his medications, he has headaches, constipation, fatigue, lightheadedness, nausea, drowsiness and eyes spots. (R. 163).

Plaintiff filed an Adult Seizure Form on June 27, 2011 stating that he had never been treated for epilepsy or seizures. (R. 172). Plaintiff stated on the form that his nerve gets pinched and that

makes his arm go numb. (R. 173). On Plaintiff's Personal Pain Questionnaire, he described aching stabbing neck pain that lasts all day. (R. 175). Plaintiff has had pain for twenty years but it has increased in the past few years. (Id.). Quick turns increase pain and give Plaintiff migraines. (Id.). Slow movement, taking medication and using neck traction helps the pain. (Id.). Plaintiff also suffers from aching and stabbing lower back pain. (R. 176). This pain lasts intermittently all day with short bursts that last from thirty minutes to one hour. (Id.). Plaintiff also reported that he suffers from upper back and mid back pain. (R. 177). Plaintiff further stated in his Pain Questionnaire that many of his problems may be related to the Persian Gulf War. (R. 179).

On a Report of Contact from DDS dated August 23, 2011, Tonya Clark wrote a vocational analysis of the Plaintiff. (R. 180). For his physical assessment she wrote that his exertional level was light and he had postural limitations. For his mental assessment, she wrote "WORK THAT DOES NOT REQUIRE SUSTAINED CONCENTRATION OR MORE THAN LIMITED SOCIAL INTERACTION." (R. 180). Ms. Clark further noted that Plaintiff could not do his prior work of a carpenter but he could perform the following jobs: Filler, Floor Worker, and Dust Mop Maker. (Id.).

On an Adult Function Report dated October 21, 2011, Plaintiff stated that his back, neck, hips, joints, muscles and bones are continuously aching and hurting. (R. 184). He also noted that movement such as walking, standing, lifting, sitting and bending often cause him severe pain. (Id.). He further claimed that his constant severe headaches, drowsiness, and fatigue makes it hard to concentrate. (Id.). Further his depression, anger, tinnitus and decreased hearing makes conversation and being around other people unbearable. (Id.). Loss of memory, occasional paralysis of his left arm and hand have made it impossible for him to do anything at all. (Id.). The report is similar to the August 23, 2011 report except that he states that he does not help out around

the house and that his wife reminds him to pay bills and that she also helps with the check book. (R. 187). Plaintiff's Personal Pain Questionnaire is also similar to the one he filled out in August 2011. (R. 192).

In an undated Disability Report, Plaintiff alleged that there have been changes in his condition since his last disability report on June 16, 2011, which started in at least August of 2011. (R. 198). He stated that his "…severe pain, fatigue and headaches have worsened." (Id.). He claimed that his medications cause severe side effects and that his memory and concentration have worsened. (Id.). Plaintiff further noted that he receives all his medical care from the VA Medical Center in Martinsburg, West Virginia and his primary care provider is Dr. Ostrow, a psychiatrist.

On December 6, 2011, Christine Sias of DDS, in the Clarksburg, West Virginia office, filed a Report of Contact stating that "THE VOCATIONAL ANALYSIS IN FILE APPEARS APPROPRIATE FOR THE RECON DETERMINATION." (R. 204).

In a Disability Report-Field Appeal-Form, Plaintiff stated his last disability report was October 12, 2011. (R. 208). Plaintiff describes the same ailments in this form but indicates that these ailments have worsened since November 2011. (R. 209). Plaintiff describes the changes in his daily living as it being painful to take showers, to use the toilet and his anger is uncontrollable. (R. 212). This form was completed by Kathi Regan, paralegal for Plaintiff's attorney on January 5, 2012. (R. 213). On May 21, 2012, Marcia Amrine of MAMPSC-FDU submitted a Report of Contact form stating that she had left a message with Kathi to let her know that she was doing a special review and would fax over a letter and barcode for any additional evidence she wanted to submit. (R. 215).

## IV.   THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step

sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled

at one of the five steps, the process does not proceed to the next step. Id.

## V. ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1. **The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.**

2. **The claimant has not engaged in substantial gainful activity since June 1, 2009, the alleged onset date. (20 CFR 404.1571 *et seq.*).**

3. **The claimant has the following severe impairments: chronic pulmonary obstructive disease, cervical and lumbar degenerative disc disease, and mood disorder (20 CFR 404.1520(c)).**

4. **The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).**

5. **After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he is unable to climb ladders, ropes, and scaffolds. He is able to occasionally climb ramps and stairs, balance, stoop, crouch, and crawl. He must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, and fumes, odors, dust, gases, and poor ventilation. He must avoid all exposure to work hazards, such as unprotected heights and dangerous machinery. He is limited to unskilled work with no contact with the public and no more than occasional interaction with coworkers and supervisors.**

6. **The claimant is unable to perform any past relevant work (20 CFR 404.1565).**

7. **The claimant was born on December 17, 1963 and was 45 years old, which is defined as a younger individual age 18-49, on alleged disability onset date (20 CFR 404.1563).**

8. **The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).**

9. **Transferability of job skills is not material to the determination of disability because using the Medical-Vocation Rules as a framework supports a finding**

that the claimant is "not disabled," whether or not the claimant has transferable job skills (see SSR 82-41, and 20 CFR 404, Subpart P, Appendix 2).

10. **Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a)).**

11. **The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2009, through the date of this decision (20 CFR 404.1520(g)).**

(R. 27-38).

## VI. DISCUSSION

### A.   Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456

(citing <u>Laws</u>, 368 F.2d at 642; <u>Snyder v. Ribicoff</u>, 307 F.2d 518, 529 (4th Cir. 1962)). In

reviewing the Commissioner's decision, the reviewing court must also consider whether the

ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it

was reached by means of an improper standard or misapplication of the law." <u>Coffman v.</u>

<u>Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

## B.    Contention of the Parties

In his Motion for Summary Judgment, Plaintiff raises three issues. (Pl.'s Br. in Supp. of

Mot. for Summ. J. ("Pl.'s Br.") at 3-14, ECF No. 11). Specifically, Plaintiff alleges that:

- The ALJ erroneously assessed the Plaintiff's Residual Functional Capacity.

- New and material evidence exists which was incorporated into the record by the appeals council.

- The Administrative Law Judge erroneously evaluated the Plaintiff's subjective complaints.

(Pl.'s Br. at 3-14, ECF No. 11).  Plaintiff requests that the court reverse the decision of the ALJ

and award judgment to Plaintiff or, in the alternative, reverse the decision and remand the matter

to the Commissioner for correction of the errors. (<u>Id.</u> at 14; Pl.'s Mot. at 1, ECF No. 10).

Defendant, in its Motion for Summary Judgment, asserts that the decision is supported by

substantial evidence and should be affirmed as a matter of law. (Def.'s Mot. at 1, ECF No.  13).

Specifically, Defendant alleges that:

- Substantial evidence supports the ALJ's RFC findings.

- Substantial Evidence supports the ALJ's weighing of Plaintiff's subjective complaints.

- Remand is not appropriate based on a VA decision post-dating the ALJ's decision.

Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.) at 6-14, ECF No. 14).

**C.    Analysis of Administrative Law Judge's Decision.**

Plaintiff asserts three major errors with the ALJ's decision.  First, the ALJ erred in assessing the RFC by not supporting her conclusions with evidence and not adequately weighing the opinion evidence and the VA disability rating.  Second, Plaintiff argues the new VA disability rating decision dated September 5, 2013 provides new and material evidence that Plaintiff was unable to secure employment during the time prior to the ALJ's decision; therefore substantial evidence no longer supports the ALJ's finding of nondisabled.  Lastly, the Plaintiff argues that ALJ erred in her credibility analysis.

**1.  The ALJ did not err in assessing Plaintiff's Residual Functional Capacity.**

The residual functional capacity of a claimant is evaluated based "on all the relevant evidence in your case record."  20 C.F.R. § 404.1520(a) (2010).  The RFC assessment is a function-by-function assessment of an individual's ability to do work-related activities that represents "not the *least* an individual can do despite his or her limitations or restrictions, but the *most*."  SSR 96-8p, 1996 WL 374184, at *1, 3 (July 2, 1996); *see also* 20 C.F.R. § 416.945(a). In making the RFC assessment, the ALJ must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform based on the evidence in the case record, and "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).  Failure to explain inconsistencies and ambiguities between the evidence and RFC determination is grounds for remand.  See Giddings v. Astrue, 333 F.App'x 649, 2009 WL 1813741, at *5 (2d Cir. 2009).

Moreover, the ALJ's decision must contain a sufficient explanation "to allow a reviewing Court to determine whether the Commissioner's decision is supported by substantial evidence." England v. Astrue, No. CIV.A. 5:07-0133, 2008 WL 867951, at *9 (S.D.W. Va. Mar. 28, 2008).

Here, the ALJ found that Plaintiff has the residual functional capacity:

…to perform light work as defined in 20 CFR 404.1567(b) except that he is unable to climb ladders, ropes, and scaffolds. He is able to occasionally climb ramps and stairs, balance, stoop, crouch and crawl. He must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, and fumes, odors, dust, gases, and poor ventilation. He must avoid all exposure to work hazards, such as unprotected heights and dangerous machinery. He is limited to unskilled work with no contact with the public and no more than occasional interaction with coworkers and supervisors.

(R. 32). The regulations define "light work" as follows:

…lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

### a. The ALJ was allowed to accord the VA disability rating little weight instead of substantial weight.

The Fourth Circuit has addressed the issue of how the SSA is to treat a VA disability rating as follows:

…[I]n *DeLoatche v. Heckler,* 715 F.2d 148, 150 n. 1 (4th Cir.1983), we held that the disability determination of a state administrative agency is entitled to consideration in an SSA disability proceeding. SSA directives have explained that the SSA is required to consider all record evidence relevant to a disability determination, including decisions by other agencies. SSR No. 06–03p, 2006 SSR LEXIS 5, at *17. However, under the regulations implementing the Social

Security Act, although the SSA will accept another agency's disability determination as evidence of a claimant's condition, that agency's decision is not binding on the SSA. 20 C.F.R. §§ 404.1504, 404.1512(b)(5). Accordingly, under the principles governing SSA disability determinations, another agency's disability determination "cannot be ignored and must be considered." SSR No. 06–03p, 2006 SSR LEXIS 5, at *17.

Bird v. Comm'r of Soc. Sec. Admin., 699 F.3d 337, 343 (4th Cir. 2012). The Fourth Circuit further held that:

> Because the purpose and evaluation methodology of both programs are closely related, a disability rating by one of the two agencies is highly relevant to the disability determination of the other agency. Thus, we hold that, in making a disability determination, the SSA must give substantial weight to a VA disability rating. However, because the SSA employs its own standards for evaluating a claimant's alleged disability, and because the effective date of coverage for a claimant's disability under the two programs likely will vary, an ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate.

Bird v. Comm'r of Soc. Sec. Admin., 699 F.3d 337, 343 (4th Cir. 2012)

(R. 37). The Fourth Circuit clearly held that although a VA disability determination should be afforded substantial weight, an ALJ may give "less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate." Bird at 343.

Plaintiff argues that substantial evidence did not support the ALJ's findings because the ALJ dismissed the VA disability rating solely because it was not a Social Security rating and the ALJ made no meaningful analysis. (Pl.'s Br. at 5). Defendant argues that the ALJ recognized that another agency's determination is not binding on the SSA and that the record before the ALJ clearly demonstrated that deviation was appropriate, allowing the ALJ to accord the disability little weight. (Def.'s Br. at 6).

The ALJ explained that she gave VA disability rating "little weight" because the rating did not clearly set forth Plaintiff's "capabilities or limitations in vocationally relevant language."

(R. 434).  Therefore, the ALJ applied the appropriate legal analysis in this case and the undersigned finds no error of law.  The issue for this court is whether there was substantial evidence in the record before the ALJ that clearly demonstrated that a deviation from the forty percent (40%) disability rating was appropriate.

To make this decision, first we must consider the VA disability rating.  On April 14, 2010, Department of Veteran's Affairs made a decision on Plaintiff's claim for service connected compensation which had been filed on December 28, 2009.  (R. 434).  The disability rating contained no analysis of the Plaintiff's "capabilities or limitation in vocationally relevant language" other than to say that Plaintiff failed to show he was unable to work. (R. 435).  The substantive part of the disability rating is as follows:

> What We Decided
> We determined the following condition was related to your military service, so
>     service connection has been granted:
> Medical Description-Radioculopathy of the left upper extremity; Percent (%)
>     Assigned-10%; Effective Date-December 28, 2009.
>
> We determined the following condition was not related to your military service,
>     so service connection couldn't be granted:
> Medical Description-Degenerative joint disease of all joints.
>
> We denied entitlement to 100% rate because it wasn't shown that you are unable
>     to work as a result of your service connected disabilities.
>
> We determined the following service connected condition hasn't changed:
> Medical Description: Degenerative arthritis, cervical spine; Percent (%)
>     Assigned-30%

(R. 435).  In summary,  the only change in Plaintiff's disability rating since he became unemployed in June of 2009 is that he was given a 10% disability rating for radioculopathy of the left upper extremity.  With regard to this VA disability rating, ALJ Pierce found as follows:

> In a determination dated April 14, 2010, the Department of Veteran Affairs
> determined that the claimant has 40 percent disability rating (Exhibit 3F).

> Pursuant to Social Security Ruling 06-03p, this decision and the evidence used to make it have been considered in accordance with 20 CFR §§ 404.1527 and 416.927, and Social Security Rulings 96-2p and 95-5p. However, the undersigned notes that pursuant to 20 CFR §§404.1504 and 416.904, a decision by any nongovernmental agency or any other governmental agency about whether a claimant is disabled is based on its rules and is not the Social Security Administration's decision about whether he/she is disabled. The Social Security Administration must make a disability determination based on Social Security law. Therefore, a determination made by another agency that a claimant is disabled is not binding on the Social Security Administration. The opinion of the Department of Veteran Affairs is accorded little weight, as this opinion does not set forth the claimant's capabilities or limitations in vocationally relevant language and is based upon other than Social Security law.

(R. 36). Again, the issue is whether there is substantial evidence in the record to support the ALJ allocating the VA disability rating "little weight." Was the ALJ's finding that the disability rating did not set forth Plaintiff's "capabilities or limitations in vocationally relevant language" a clear demonstration that the deviation was appropriate? (R. 36).

The VA disability rating consisted of merely three pages in the record and clearly does not set forth any vocational capabilities or limitations other than the Plaintiff is able to work. (R. 434-436). The only change in the VA disability rating since Plaintiff's onset date was the increase of 10% disability for radioculopathy of the left upper extremity, making the total disability rating equal 40%. The depth of the ALJ's analysis appropriately corresponded to the depth of the VA disability rating. The ALJ considered the radioculopathy of the left upper extremity as noted below:

> Upon examination, treatment records, reflect that the claimant exhibited subjective neck, back and left upper extremity tenderness; a limited range of back motion; decreased monofilament perception of the left arm; reduced left upper extremity range of motion and reflexes; paraspinal muscle spasm and positive straight leg raising (Exhibits 2f, 3F, 14F and 19F). However, treating and examining medical sources within the Veteran's Administration health system noted that the claimant exhibited full range of elbow, wrist, finger, thumb, hip, knee, and ankle movement; no motor impairment; full muscle strength; no muscle atrophy; no

> impaired hand dexterity; normal coordination; normal lower extremity
> sensation; normal heel and toe walking; no rales, rhonci or wheezing; and
> clear and regular breathing upon examination (Exhibit 2F, 3F, 14F and
> 20F).

(R. 33). These findings further aligned with the consultative examination by Dr. Webb who reported "Intermittent numbness in the left upper extremity suggestive of cervical spine disk with nerve root irritation." (R. 591). "On range of motion testing, he had 160 degrees flexion of both shoulders and 160 degrees left shoulder adduction with 20 degrees adduction and internal rotation. Otherwise, the upper extremities were normal." (R. 590). Dr. Lateef's physical residual functional capacity compensated for these limitations by reducing Plaintiff to light work with no other restrictions. (R. 599). Substantial Evidence supports the ALJ's determination to give the VA disability rating little weight because there was no analysis of the corresponding vocational limitations, which were later developed by Dr. Webb and Dr. Lateef.

Accordingly, the undersigned finds that there was no legal error and the ALJ's determination to accord the VA disability rating little weight was supported by substantial evidence.

### b. The ALJ properly evaluated the State Agency's Mental Assessment by including "unskilled" work in the Plaintiff's RFC

Plaintiff argues that the ALJ failed to include a limitation upon Plaintiff's concentration in her RFC determination. (Pl.'s Br. at 6). Defendant argues that the ALJ accounted for Plaintiff's mental limitations by restricting the Plaintiff to unskilled work, the least mentally demanding kind of work,[1] with no public contact and only occasional interaction with coworkers and supervisors. (Def.'s Br. at 8).

---

[1] see 20 CFR §404.1568(a)

Dr. Comer, the State Agency psychologist, opined that Plaintiff, "...appears to have the mental/emotional capacity for work like activity in a work environment that does not require sustained concentration or more than limited social interaction and that can accommodate his physical limitation. (R. 586). The ALJ used this mental analysis in her RFC stating in pertinent part that: "He is limited to unskilled work with no contact with the public and no more than occasional interaction with coworkers and supervisors." (R. 32). The ALJ further explained that:

> State agency psychological consultants determined that the claimant has moderate limitations in sustained concentration and persistence, social interaction and adaptation and no significant limitation in understanding and memory…. The opinion of the State agency is accorded great weight to the extent that it is consistent with the limitation reflected in the residual functional capacity, which are well supported by the medical evidence of record, including treatment records reflecting that the claimant exhibited good attention, intact memory, logical thought flow, good judgment, normal comprehension of commands, no psychomotor agitation or retardation, appropriate grooming and no psychosis upon examination…..

(R. 36)(internal citations omitted). Further, the ALJ assigned Plaintiff's past relevant work as medium exertional level, skilled SVP 7. (R. 37). The ALJ reduced Plaintiff's work to light exertional and unskilled in her RFC to accommodate for physical and mental limitations. Unskilled work "is commonly understood to indicate work not requiring sustained concentration." Turman v. Astrue, No. 3:09CV468-FDW-DSC, 2010 WL 4683921, at *5 (W.D.N.C. July 8, 2010) report and recommendation adopted, No. 3:09-CV-468-FDW-DSC, 2010 WL 4683918 (W.D.N.C. Nov. 10, 2010).

The undersigned finds that there is no legal error and that substantial evidence supports the ALJ's decision.

### c. The ALJ properly evaluated the Plaintiff's complaints of chronic pain syndrome and the weight she accorded Dr. Moran's opinion was supported by substantial evidence.

The Plaintiff suggests that he was diagnosed with chronic pain syndrome as a stand-alone illness but then refers only to Dr. Moran's examination regarding that diagnosis. Defendant argues that Dr. Moran attributed Plaintiff's chronic pain to Plaintiff's spinal conditions and that it was not an "unexplained chronic multisystem illness." Dr. Moran was performing a one-time examination of the Plaintiff related to his Veterans Administration benefits and proceedings. On August 12, 2011, Dr. Moran examined the Plaintiff to determine whether Plaintiff's complaint of chronic pain syndrome meets the "gulf war criteria" for a "diagnosed medically unexplained chronic multisystem illness." (R. 656). Dr. Moran determined that Plaintiff did not meet that criteria and opined as follows:

> I would opine that this veteran's symptoms can all be explained based on known pathology and that an undiagnosed illness does not need to be hypothesized. This veteran suffers from chronic pain related to cervical and lumbar disc disease. He has chronic headaches which are also related to cervical disc disease. He also experiences dyspnea on exertion due to COPD. He suffers mood disorder for which he is followed by psychiatry which has been opined as secondary chronic medical issues. His mood disorder is most probably responsible for problems with sleep impairment and memory disturbance. The veteran's GI symptoms of intermittent constipation and intermittent loose bowel movements are by the veteran's admission related to medication taken for chronic pain. The veteran now notes gradual development of overall chronic pain affecting all joints and muscle groups which is additional to his previous symptoms of chronic neck and back pain.... **This case does have similarities with case of fibromyalgia however as this case of chronic pain syndrome arises from previously well-**

41

**defined cervical and lumbar pathology it does not meet the gulf
war criteria of a 'diagnosed medically unexplained chronic
multisystem illness.'**

(R. 655-56, 728-29)(emphasis added). The ALJ stated several times in her opinion that the

medical evidence supports COPD, cervical and lumbar degenerative disc disease and her RFC

takes into consideration all limitations from those impairments. (R. 33, 34). The ALJ further

stated that the medical evidence did not support the limitations asserted by the claimant. (R. 34).

The ALJ noted that Plaintiff's severe physical impairments have "been treated conservatively since

his alleged onset of disability, and have been associated with limited objective findings." (R. 35).

The ALJ found that "[i]n an opinion dated August 12, 2011, Dr. Robert Moran opined that the

claimant's conditions do not meet the Gulf War criteria of a 'diagnosed medically unexplained

chronic multisystem illness.'" (R. 36). The ALJ accorded Dr. Moran's opinion "…little weight as

the opinion does not assert the claimant's capabilities or limitations in vocationally relevant

language." (Id.).

The undersigned finds that there is no legal error and that substantial evidence supports the

ALJ's decision.

> **d. The ALJ properly evaluated the opinion of Dr. Garcia Santos, who was
> also a one-time examining physician related to Veterans Administration
> benefits and proceedings.**

The RFC assessment is a function-by-function assessment of an individual's ability to do

work-related activities that represents "not the *least* an individual can do despite his or her

limitations or restrictions, but the *most*." SSR 96-8p, 1996 WL 374184, at *1, 3 (July 2, 1996);

*see also* 20 C.F.R. § 416.945(a). Dr. Santos performed a one-time compensation and pension

examination of the Plaintiff on February 8, 2010.  (R. 246-264).  Dr. Santos opined on February 8, 2010 as follows:

> The CONDITION/DISABILITY Unemployability IS NOT CAUSED BY OR A RESULT OF service connected neck condition.  RATIONALE FOR OPINION GIVEN:  The veteran states he stopped working because of both back and neck conditions.  He was seen in May 2009 in the ER for an acute flare-up of lower back pain.  He has limitation from his service connected cervical spine condition, but also limitations from his non-service connected lumbar spine condition.  Both will limit him from returning to his usual occupation- construction work.  However, he can be retrained and most likely will benefit from sedentary employment where he can refrain from lifting, prolonged walking, prolonged standing, pushing and pulling activities which can impact on his spine.

(R. 264).    The Plaintiff argues that the ALJ erroneously rejected the opinions of Dr. Santos.  (Pl.'s Br. at 7).  Plaintiff interprets Dr. Santos' opinion as follows:  "Plaintiff needed to refrain from lifting, prolonged standing, and pushing and pulling activities which can impact on his spine."  (Pl.'s Br. at 8).  However, the actual quote from Dr. Santos is that Plaintiff "can be retrained and most likely **will benefit** from sedentary employment where he **can refrain** from lifting, prolonged walking, prolonged standing, pushing and pulling activities which can impact on his spine." (Emphasis added, R. 264).  Although the ALJ gave Dr. Santos opinion little weight, Dr. Santos does not give an opinion of the "most" the Plaintiff can do despite his limitations.  He merely indicates that Plaintiff would "benefit" from sedentary employment.  Further Dr. Santos does not indicate that Plaintiff "needed to refrain…" from certain activities but that sedentary work would be beneficial to the Plaintiff because he would then have the ability to refrain from some of these activities.

Defendant argues that a physician's opinion "does not bind the ALJ on the issue of functional capacity."  Brown v. Astrue, 649 F.3d 193, 197 n.2 (3d Cir. 2011).  The ALJ is the fact-finder and has the exclusive duty to evaluate medical opinions.  (Def.'s Br. at 10).  Further

Defendant argues that an ALJ should evaluate consultative examiners opinions under the factors listed in 20 C.F.R. §404.1527, including the opinion's supportability and the opinion's consistency with the record as a whole.  (Id.).

Although the medical records reveal a lengthy one time examination by Dr. Santos, it is clear that he is a consultative examiner and not Plaintiff's primary treating physician.  The ALJ set forth his reasoning for giving Dr. Santos opinion little weight as follows:

> It is inconsistent with the medical evidence of record, including treatment records reflecting that claimant exhibited full range of elbow, wrist, finger, thumb, hip, knee, and ankle movement; no motor impairment; full muscle strength; no muscle atrophy; no impaired hand dexterity; normal coordination; normal lower extremity sensation; normal heal and toe walking; no rales, rhonchi, or wheezing; clear and regular breathing upon examination; and no muscle spasm, tenderness, or guarding severe enough to responsible for an abnormal gait upon examination (Exhibits 2F, 3F, 14F, 19F, and 20F).

(R. 36).  This explanation supports the ALJ's findings giving Dr. Santos opinions little weight.

Additionally, Plaintiff argues that a general observation made by Dr. MacDonald, a psychologist for the WVDDDS, during a one-time examination on August 25, 2011 that Plaintiff had difficulty walking is evidence that Plaintiff had problems walking. (Pl's Br. at 8, R. 567). Even though, this evidence conflicts with Dr. Santos' physical examination which clearly stated Plaintiff had a normal gait. (R. 262).  Dr. Santos further opined no limitations on standing, able to walk a quarter of a mile and has no assistive devices or aids.  (R. 258).  During Dr. Santos physical examination of Plaintiff's spine, he noted that Plaintiff's gait was normal and that there was no "…muscle spasm, localized tenderness or guarding severe enough to be responsible for abnormal gait…"  (R. 250).

Plaintiff also cites to Dr. Webb's general observations during a one-time disability determination exam. Dr. Robert Webb performed a thorough examination of the Plaintiff on August 10, 2011. Specifically, Plaintiff cites to the section of Dr. Webb's report called Vital Signs, which were a combination of Dr. Webb's observations and the Plaintiff's subjective complaints. (R. 590). During the physical examination, Dr. Webb reported that Plaintiff

> …was able to stand up from the chair with his arms held up. He pointed to the upper thoracic spine and through the entire lumbar spine areas as site of the pain today. He had a lot of paravertebral muscle spasm through his spine and he sat bent forward and leaning to the right. He shifted his weight from side to side….

(R. 590). Again, these were observations made by Dr. Webb in combination with Plaintiff's subjective complaints. However, Dr. Webb reported in the Neurologic section of his report that Plaintiff "could squat fully, could walk on his heels and toes…" (R. 590). Further Dr. Web reported that Plaintiff's "gait was stable, but he walked bent to the side." (Id.). There is nothing noted in Dr. Webb's report regarding any limitations in walking or that Plaintiff's gait was abnormal. (R. 588-591).

The Plaintiff argues that the ALJ erred in her failure to "include limitation upon the Plaintiff's ability to stand and walk in his residual functional capacity assessment." (Pl.'s Br. at 9). For the reasons stated above, Dr. Webb and Dr. MacDonald's reports do not support Plaintiff's argument. Further, even Dr. Santos opined that Plaintiff had no limitations on standing. (R. 258). And although Dr. Santos opined that Plaintiff would benefit from sedentary employment, he did not opine that sedentary exertion was the maximum the Plaintiff could do with his limitations. (R. 249-250). In fact, Dr. Santos' only limitation on walking was a quarter of a mile at a time and that during flare ups, Plaintiff should pace his walking and lifting. (R.

249).  Again, the ALJ properly gave Dr. Santos' opinion little weight as it did not comport with the majority of evidence in the record indicating Plaintiff had a normal gait.  (R 36).

The undersigned finds that there is no legal error and that substantial evidence supports the ALJ's decision.

### e. The ALJ properly weighed the opinion of the DDS psychiatric consultative examiner, Dr. MacDonald.

Plaintiff argues that the ALJ failed to properly evaluate vocationally –relevant evidence and erroneously rejected pertinent evidence of Dr. MacDonald.  (Pl.'s Br. at 9). Defendant argues that the ALJ properly weighed and considered the evidence.  (Def.'s Br. at 12).

The ALJ reported that Dr. MacDonald's opinion was that "claimant has fair capability but probably cannot concentrate long enough to handle at least simple finances." (R. 35).  The ALJ then noted that:

> this opinion is inconsistent with the medical evidence of record, including treatment records reflecting that claimant exhibited good attention, intact memory, logical thought flow, good judgment, normal comprehension of command, no psychomotor agitation or retardation, appropriate grooming and no psychosis upon examination (Exhibits 2F, 14F, and 20F).

(R. 35).  Plaintiff argues that the rejection of Dr. MacDonald's opinion is erroneous because even Plaintiff's treating psychiatrist, Dr. Ostrow, reported GAF of 50 for the Plaintiff.  (Pl.'s Br. at 9). However, it is Dr. Ostrow's records to which the ALJ points to for the inconsistencies in Dr. MacDonald's opinion.  (R. 270).  On May 13, 2011, Dr. Ostrow examined plaintiff and noted Plaintiff's thought flow was "spontaneous, linear, logical, goal directed." (R. 270).  Dr. Ostrow further noted that Plaintiff was oriented to all spheres and was "alert." His memory was intact,

his attention good; his intelligence average; his judgment good; and his insight good. (R. 270).

Treating psychiatrist, Dr. Ostrow further noted that Plaintiff's mental activity was normal and

that he had no psychomotor agitation or retardation. (R. 270). It is clear that the ALJ is pointing

to the treating psychiatrist records when determining that Dr. MacDonald's opinion should be

accorded little weight.

The undersigned finds that there is no legal error and that substantial evidence supports the

ALJ's decision.

### 2. New and material evidence exists that the ALJ should weigh.

The "Appeals Council is required to consider new and material evidence relating to the

period on or before the date of the ALJ decision in deciding whether to grant review." Wilkins v.

Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 95 (4th Cir. 1991). "Evidence is new

within the meaning of this section if it is not duplicative or cumulative." Id. at 96. Evidence is

material if there is a reasonable possibility that the new evidence would have changed the

outcome. Id. The regulations provide:

> (b) If new and material evidence is submitted, the Appeals Council
> shall consider the additional evidence only where it relates to the
> period on or before the date of the administrative law judge
> hearing decision. The Appeals Council shall evaluate the entire
> record including the new and material evidence submitted if it
> relates to the period on or before the date of the administrative law
> judge hearing decision. It will then review the case if it finds that
> the administrative law judge's action, findings, or conclusion is
> contrary to the weight of the evidence currently of record.

20 C.F.R. § 404.970 (2011).

It appears in this case that the Appeals Council did not incorporate the new VA disability rating decision dated September 5, 2013 (hereinafter "2013 VA decision") into the record because it was dated after the ALJ's decision, which was April 15, 2013. (R. 2).   The Appeals Council noted,

> We also looked at a VA decision, dated September 5, 2013 (7 pages).  The Administrative Law Judge decided your case through April 15, 2013.  This new information was issued after the hearing decision dated April 15, 2013. Therefore, it does not affect the decision.

(R. 2).  However, the September 5, 2013 VA decision was made part of the administrative record as it was attached to a letter from Plaintiff's counsel dated September 25, 2013. (R. 8-14). Therefore, the undersigned will review the September 5, 2013, VA decision as if it had been incorporated into the record by the Appeals Council.

The Plaintiff argues that this September 5, 2013 VA decision is new and material.  (Pl.'s Br. at 10).  However, it appears to the court that the main issue is whether this decision relates back to the period of time prior to the ALJ's decision.  Defense counsel argues that since this decision was issued five months after the ALJ's decision, it has no bearing on or before the date of the ALJ's decision. (Def.'s Br. at 14).  Defense counsel cites to <u>Irving v. Astrue</u>, No. 10-1657, 2011 WL 2173780, at *9 (D. Colo. June 1, 2011), for the proposition that a VA rating after the ALJ's decision should not be considered by the Appeals Council.  (<u>Id.</u>).  In the <u>Irving</u> case, the court found that,

> Although the 2010 VA Rating Decision might be material (and certainly new), the finding  of disability was based largely on a VA examination that occurred on March 19, 2009, a date after the ALJ's decision  was issued.  It is conceivable that the March 19, 2009 medical opinion may relate to a date on or before the ALJ's hearing decision but that opinion was not submitted to the Appeals Council….

(<u>Irving</u>, at *9).

In this case, the VA decision is dated September 5, 2013, and relates to a new claim for benefits which was filed on September 17, 2012. (R. 9). The ALJ's decision in the social security case is dated April 15, 2013. The 2013 VA decision was as follows: "Based on a review of the evidence listed below, we have made the following decisions on your claim. Decision: 1. Entitlement to nonservice-connected pension is granted…." (R. 9). Paragraphs two through ten of the 2013 VA decision deny service connected benefits for bilateral hip pain, muscle pain, chest pain due to Gulf War exposure, chronic fatigue, chronic obstructive pulmonary disease, mood disorder with fatigue, chronic sleep disturbance, and memory loss, degenerative joint disease spine, severe back pain and degenerative joint disease of all joints (Gulf War). (R. 9-10). The evidence reviewed in making this 2013 VA decision was as follows:

- VA form 21-527 EZ received on January 9, 2013
- 5103 Letter, dated July 18, 2013
- Electronic reviewed treatment records, Martinsburg VAMC, from October 13, 2001 through July 18, 2013
- Electronic reviewed treatment records, Baltimore VAMC, from July 2, 2008 through July 18, 2013
- Electronic reviewed treatment records, Washington DC VAMC, from November 19, 1992 through June 27, 2008
- Electronic reviewed treatment records, Martinsburg VAMC from July 29, 2013 through August 29, 2013.

(R. 10). The explanation for the 2013 VA decision was as follows:

…The Department of Veteran Affairs has determined you are permanently disabled due to your degenerative arthritis of the cervical spine, radiculopathy of the left upper extremity, tinnitus, COPD, sever back pain, degenerative disc disease of the spine and mood disorder. We also determined that you are unable to secure and maintain substantially gainful employment due to your disability. You are entitled to pension.

(R. 10-11).

Plaintiff argues that the 2013 VA decision is "new" and "material" in that it makes a finding that Plaintiff is unable to secure or maintain substantially gainful employment due to his disability. (R. 11). Defendant makes two arguments. The first argument is that the September 5, 2013 decision post-dates the ALJ's decision and therefore should not be considered. (Def's Br. 14). Second, Defendant argues that "there is no reasonable possibility that the conclusory, six-page decision from the VA about Plaintiff's pension award- unaccompanied by any supporting medical documentation- would alter the outcome of the case." (Def.'s Br. at 14).

The <u>Meyer</u> case has provided an illustration of the Fourth Circuit's analysis when new and material evidence conflicts with other record evidence relied on by the ALJ. <u>Meyer v. Astrue,</u> 662 F.3d at 700, 702 (4th Cir. 2011). The absence of additional fact finding "does not render judicial review 'impossible' – as long as the record provides 'an adequate explanation of [the Commissioner's] decision,'" and substantial evidence supports the ALJ's findings. <u>Meyer,</u> 662 F.3d at 702 (<u>quoting</u> <u>DeLoatche v. Heckler,</u> 715 F.2d 148 (4th Cir.1983)). When a review of the new evidence still allows the conclusion that substantial evidence supports the ALJ's decision, the ALJ's denial of benefits should be affirmed. However, when the new evidence conflicts with "other record evidence credited by the ALJ," the Fourth Circuit has found remand to be the appropriate remedy. <u>Id.</u> at 707; <u>see also</u> <u>Smith v. Chater,</u> 99 F.3d 635, 638 (4th Cir. 1996) (finding that "[t]he duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court.").

Although there is no Fourth Circuit case on point, both the <u>Irving</u> case cited above and a Ninth Circuit have held that an intervening disability rating by the VA did not warrant remand. <u>DeOcampo v. Comm'r of Soc. Sec.,</u> 552 F. App'x 726, 727 (9th Cir. 2014). In the DeOcampo

case, DeOcampo conceded that the VA's decision was based on the same medical information presented to the ALJ.  Id.  However, the Court of Appeals held that DeOcampo "…failed to show that there is a "reasonable possibility" that, had the ALJ considered the VA rating, the result of the proceedings would have been different."  Id.  The DeOcampo court further explained that none of the "…circuits related precedents require the ALJ – as opposed to the Appeals Council –to consider a rating issued after the ALJ's decision, and the Appeals Council did consider the VA rating in this case."

Likewise, in this case the Appeals Council reviewed the 2013 VA decision and found that it post-dated the ALJ's decision and did not incorporate the 2013 decision into the record for review.  However, the 2013 VA decision was contained in the record and the undersigned considered it.  Although the 2013 VA decision identifies the Plaintiff as not being able to maintain substantial employment, it does not give an effective date for that determination other than September 5, 2013.  (R. 9-14).  The 2010 VA decision clearly states that the Plaintiff was employable at that time.  The 2013 VA decision does not indicate that the effective date of Plaintiff's employability should be prior to September 5, 2013. (Id.).  Additionally, the 2013 VA decision speaks in terms of non-service connected pension when discussing employability.  The 2010 VA decision speaks only in terms of service connected compensation.  Therefore, the ALJ finds that the 2013 VA post-dates the ALJ decision and there has been no showing that it conflicts with the evidence the ALJ reviewed or the decision that the ALJ made.  Accordingly, the 2013 VA decision still allows the conclusion that substantial evidence supports the ALJ's decision, therefore, the ALJ's denial of benefits should be affirmed.

**3. The Administrative Law Judge properly evaluated Plaintiff's subjective complaint.**

The remaining issue raised by the Plaintiff concerns whether the ALJ correctly considered Plaintiff's credibility. The determination of whether a person is disabled by pain or other symptoms is a two-step process. See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1); SSR 96-7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medial evidence an impairment capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ considers the credibility of the claimant's subjective allegations of pain or other symptoms in light of the entire record. Id.

Social Security Ruling 96-7p sets out some of the factors used to assess the credibility of an individual's subjective symptoms, including allegations of pain. SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Some of the factors include: the individual's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; any medication taken to alleviate pain or symptoms; and treatment and other measures used to relieve symptoms. (Id.). The ALJ must do more than "recite the factors that are described in the regulations for evaluating symptoms." Id. Rather, the ALJ's "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. However, there is no requirement that the ALJ state specific findings as to each factor. See Epperson v. Astrue, Civil Action No. 2:11–CV–12–D, 2012 WL 3862717, at *4 (E.D.N.C. Sept. 5, 2012). Further, because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations

concerning the claimant's credibility are given great weight.  <u>Shively v. Heckler</u>, 739 F.2d 987, 989-90 (4th Cir. 1984).

Plaintiff argues that the ALJ "specifically found that the Plaintiff was not credible, based, at least in part, upon the Plaintiff's daily activities" and that this reliance on daily activities was improper.  (Pl.'s Br. at 12).  Additionally, Plaintiff argues that the ALJ found the Plaintiff was "not credible" when the ALJ actually found that the Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms are "not entirely credible." (R. 33).

Defendant argues that the ALJ articulated specific reasons for her credibility finding which were well supported by the evidence of record as she was required to do.  (Def.'s Br. at 13).  Further, although Plaintiff focuses on the ALJ's analysis of Plaintiff's daily activities, the ALJ also pointed to the medical records showing that Plaintiff's diagnostic tests were minor and his physical examinations relatively normal; that Plaintiffs treatment for his symptoms was conservative and that mentally he had good attention, intact memory and logical thought flow.  (Def.'s Br. at 13).

The ALJ found that Plaintiff had only mild restrictions in daily living and moderate difficulties in social functioning. (R. 31).  Further, the ALJ found Plaintiff had moderate difficulties with regard to concentration, persistence or pace. (R. 31).  The ALJ's RFC coincides with Physical Residual Functional Capacity given by Dr. Lateef of the DDS on August 17, 2011. (R. 593).  With regard to Plaintiff's daily living and credibility, the ALJ noted that:

> Despite his impairments, Mr. Hutton reported in his written statements and testimony that he is able to live with others, perform house repairs, wash laundry, wash dishes, mow with assistance, go outside daily, pay bills, count change, handle a savings account, use a checkbook/money orders, and watch television (Exhibits 3E and 9E).  Additionally, although the claimant testified that he no longer drives or shops, he reported in his written statements that he is able to perform limited driving and shop in stores for groceries. (Exhibit 3E).  After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some

of the alleged symptoms; however, the claimant's statement concerning the
intensity, persistence and limiting effects of these symptoms are not entirely
credible for the reasons explained in this decision.

(R. 33). The ALJ cites to exhibits 3E and 9E in reviewing Plaintiff's daily activities. Exhibit 3E

is Plaintiff's Adult Function Report (FR) dated June 26, 2011 and Exhibit 9E is Plaintiff's Adult

Function Report (FR) dated October 21, 2011. Plaintiff argues that in June of 2011, he could do

all the daily activities that he listed, but by October 21, 2011, he could no longer do any food

preparation, could do no household chores, hardly ever drove, did no shopping and had no social

activity. (Pl.'s Br. at 13). Plaintiff further argues that at the hearing on April 2, 2013, that he

also testified that he could no longer do these activities. (Id.). However, the medical records do

not reflect any significant change in the Plaintiff's health from June of 2011 to October of 2011.

Additionally, the Plaintiff testified at the hearing in 2013 that he may wash dishes a minute or

two when he can stand and that he holds a valid driver's license even though he stopped driving

two years ago because of the pain. (R. 53). Daily activities are certainly one of the factors that

the ALJ takes into consideration in determining the Plaintiff's credibility. It is clear from the

record that the ALJ considered both the Adult Function Report dated June 2011 and October

2011 and the testimony of the Plaintiff regarding these activities at the April 2013 hearing.

The ALJ also looked to the Plaintiff treatment records to determine credibility. The ALJ

emphasized throughout her analysis of the medical records that the treating physicians described

claimant's cervical and lumbar degenerative disc disease as "mild." (R. 33). Further the treating

physicians note throughout that Plaintiff has a normal gait and range of motion and the ability to

squat fully. (R.33-34). The ALJ finds that although there is objective medical evidence that

Plaintiff has COPD, cervical and lumbar degenerative disc disease, and mood disorder, this

medical evidence does not support the limitations asserted by the claimant. (R. 34). The ALJ

further explains that these physical impairments have been treated "conservatively" and are associated with limited objective findings. (R. 35).

In compliance with the <u>Craig</u> case, the ALJ considered the Plaintiff's daily activities, objective medical evidence, and his improvement with treatment, his conservative treatment and his functional limitations. After a thorough analysis in her decision, the ALJ found that:

> The objective medical findings, his treatment record, and his admitted activities of daily living and functional capacities, serve to diminish the claimant's credibility regarding the frequency and severity of his symptoms and the extent of his functional limitations.

(R. 35). The ALJ clearly does not look at Plaintiff's daily activity alone but in combination with other factors to reach her decision regarding Plaintiff's credibility.

The undersigned finds that there is no legal error and that substantial evidence supports the ALJ's decision on credibility.

## VII.     RECOMMENDATION

For the reasons herein stated, the undersigned finds that the Commissioner's decision denying the Plaintiff's application for DIB and SSI should be **AFFIRMED** as the ALJ made no legal errors and substantial evidence supported the ALJ's decision. Accordingly, I **<u>RECOMMEND</u>** that Plaintiff's Motion for Summary Judgment (ECF No. 10) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 13) be **GRANTED**, and the decision of the Commissioner be affirmed.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections.

A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn., 474 U.S. 140 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 9th day of March, 2015.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE